UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) JAMES GRAHAM, as SPECIAL ADMINISTRATOR for the ESTATE OF ANTHONY HUFF, Deceased, | |
|       Plaintiff, | |
| vs. | Case No. 5:17-cv-00634-M |
| (1) GARFIELD COUNTY CRIMINAL JUSTICE AUTHORITY, an Oklahoma Title 60 authority;<br>(2) BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF GARFIELD, a Political Subdivision of the State of Oklahoma;<br>(3) JERRY NILES, individually, and in his official capacity as Sheriff of Garfield County;<br>(4) JENNIFER NILES, individually and in her official capacity as Jail Administrator of the Garfield County jail;<br>(5) TURN KEY HEALTH CLINICS, LLC, an Oklahoma limited liability corporation;<br>(6) LELA GOATLEY, an individual;  and<br>(7-9) JOHN DOES (1-3), unknown individuals who were involved but not yet identified, | **JURY TRIAL DEMANDED** |
|       Defendants. | |

## SECOND AMENDED COMPLAINT

COMES NOW Plaintiff, James Graham, as Special Administrator for the Estate of

Anthony Huff, Deceased, and alleges and states as follows:

### I. Jurisdiction and Venue

1.    That this action is brought pursuant to 42 U.S.C. §1983 and the Fourth, Eighth

and Fourteenth Amendments to the United States Constitution, as well as the laws of the

State of Oklahoma.

2.    That this Court has federal question jurisdiction of this action pursuant to

28 U.S.C. §1331; venue is proper pursuant to 28 U.S.C. §1391.

3.      That the matter in controversy exceeds $75,000, exclusive of costs and interest.

4.      That Plaintiff also asserts causes of action arising under Oklahoma law, namely claims for negligence, assault and battery and wrongful death. This Court has supplemental jurisdiction over these claims pursuant to 28 U.S.C. §1367.

5.      That Plaintiff is now, and was at all times material hereto, a resident of Garfield County, State of Oklahoma. (Plaintiff's decedent shall be referred to as "Mr. Huff" or "Plaintiff's decedent" or "Anthony Huff.")

6.      That Defendant Garfield County Criminal Justice Authority ("GCCJA") is now, and was at all times material hereto, an Oklahoma Title 60 authority.

7.      That Defendant Board of County Commissioners of the County of Garfield ("BOCC") is a political subdivision of the State of Oklahoma responsible for the GCCJA and is properly named pursuant to 19 O.S. §4.

8.      That Defendant Jerry Niles ("Defendant Sheriff Jerry Niles" or "Jerry Niles"), is a duly elected Sheriff of Garfield County, Oklahoma, a political subdivision of the State of Oklahoma, and is responsible for the operation of the GCCJA. Jerry Niles is sued in both his individual capacity and in his official capacity for acts performed while he was the Sheriff of Garfield County. Jerry Niles is sued for both federal and state law claims. At all times relevant herein, Jerry Niles was acting under the color of law and, based on discovery to-date, was acting outside the course and scope of his employment with Garfield County, State of Oklahoma as it relates to his conduct that violated the standards listed herein, and to the extent he helped create a standard, practice, procedure, custom and pattern of conduct that violated the constitutional rights of Mr. Huff and both state and federal law.

9.      That Defendant Sheriff Jerry Niles, as Sheriff of Garfield County, is the final policymaker for the Garfield County Sheriff's office. There is no other person who has authority over the Sheriff of Garfield County, acting in his capacity as Sheriff. Both as to his own conduct and conduct of his employees, because of his position as Sheriff for Garfield County, the acts, customs, policies, practices, failure to train and failure to supervise his employees alleged herein are attributable to the county as well as to the sheriff in his official capacity.

10.      That Defendant Jennifer Niles ("Jennifer Niles") is and was at all times pertinent to this action the Jail Administrator or Detention Administrator of Garfield County, Oklahoma, a political subdivision of the State of Oklahoma, and is responsible for the operation of the GCCJA. Jennifer Niles is sued in both her individual capacity and in her official capacity for acts performed while she was the Jail Administrator of Garfield County. Jennifer Niles is sued for both federal and state law claims. At all times relevant herein, Jennifer Niles was acting under the color of law and, based on discovery to-date, was acting outside the course and scope of her employment with Garfield County, State of Oklahoma as it relates to her conduct that violated the standards listed herein, and to the extent she helped create a standard, practice, procedure, custom and pattern of conduct that violated the constitutional rights of Mr. Huff and both state and federal law.

11.      That Defendant Lela Goatley ("Goatley") is an individual who was at all times pertinent to this action a resident of the State of Oklahoma and a nurse who worked for Defendant Turn Key. Defendant Goatley was responsible for providing care, monitoring and observing Mr. Huff during the time he was placed in the restraint chair and ensuring he had been properly administered his medications and medical care.

3

12.     That Defendant John Doe(s) 1-3 represent other persons whose identities are not yet known but caused or contributed to Anthony Huff's death by virtue of their position, acting under the color of law, negligence and intentional conduct.

13.     That all of the conduct of the Defendants was within the exercise of State authority within the meaning of 42 U.S.C. §1983.

14.     That by and through Defendant Sheriff Jerry Niles, Garfield County deliberately failed to take remedial action in the face of actual and/or constructive knowledge of constitutional violations and the assault and battery against Plaintiff's decedent.

15.     That Turn Key Health Clinics, LLC ("Turn Key") is now, and was at all times material hereto, a corporation organized under the laws of the State of Oklahoma and provides and manages the day-to-day medical operations in jails. At all times pertinent to this action, Turn Key was acting under the color of state law pursuant to its contract with the State of Oklahoma and control over providing medical services to those detained (such as Mr. Huff in this case) in the GCCJA and, pursuant to the contract with the BOCC and GCCJA, was an instrumentality of the State, BOCC and GCCJA and subject to their constitutional requirements.

16.     That, at all material times herein, Defendant Sheriff Jerry Niles, as elected Sheriff of Garfield County, was responsible for providing detainees at the GCCJA with reasonable medical care.

17.     That, pursuant to the Governmental Tort Claims Act, the Plaintiff submitted a Notice of Tort Claim which was received by the County on February 28, 2017. This case is being filed at this time so as to preserve and protect the Statute of Limitations on behalf of the Plaintiff.

4

18.    That at all material times hereto, Anthony Huff was a resident of Garfield County, State of Oklahoma.

19.    That the acts and/or omissions giving rise to the Plaintiff's claims arose in Garfield County, State of Oklahoma, which is within the confines of the United States District Court for the Western District of Oklahoma.

II. Factual Background

20.    That Plaintiff adopts and re-alleges all material allegations in paragraphs 1 through 19 as if set forth below.

21.    That on June 4, 2016, Anthony Huff was taken into custody on suspicion for Public Intoxication by the Enid Police Department and placed into the GCCJA.

22.    That the GCCJA and Turn Key were familiar with Mr. Huff from prior detentions, including a Medical/Mental Screening completed by Mr. Huff on January 10, 2016 and a screening performed by Turn Key on May 17, 2016. Based on records from the prior admissions, medical staff knew Mr. Huff required medication for heart disease; suffered from insomnia, hypertension and depression; and knew he took Coreg and Lisinopril for coronary artery disease, and Sertaline and Zoloft for depression, and has a reported a history of alcoholism and was at risk of alcohol withdrawal.

23.    That on June 4, 2016, when Mr. Huff was taken into custody, he did not receive an initial medical screening and was booked into GCCJA without any of his prescribed medications.

24.    That, at some point during the time of his incarceration, Mr. Huff started experiencing hallucinations and exhibiting delusions.

25.     That, on June 6, 2016, Mr. Huff was placed in a restraint chair where he remained until his death on June 8, 2016.

26.     That, at the time of his death, only a trace of Sertaline and no other medications were found in Mr. Huff's blood.

27.     That, prior to being placed in the restraint chair, the GCCJA's records reflect –from an absence of confirmation – that Mr. Huff's medical record was not reviewed by medical personnel for any medical condition that may affect the use of the restraint chair. However, the GCCJA records obtained in this litigation show that the GCCJA and, therefore, Defendants Turn Key and Goatley, obtained records from other providers in May of 2016, less than 30 days from when Mr. Huff was detained (as outlined below) and knew the contents of those records when Mr. Huff was detained again in June of 2016.

28.     That, if Mr. Huff's medical record was reviewed by medical personnel before being confined to the restraint chair, no such medical condition or review was documented in the medical/clinical record.

29.     That the policies and procedures of the State of Oklahoma and Garfield County related to the use of the restraint chair required that medical personnel evaluate the detainee (in this case, Mr. Huff) to give medical approval as to the use of the restraint chair, and also required such personnel to exercise supervision while he was in the restraint chair.

30.     That, prior to being placed in the restraint chair, a medical recommendation or approval of the restraint chair for use on Mr. Huff was not issued or obtained.

31.     That at all times pertinent to this action, the policies and procedures of the GCCJA related to the use and implementation of a restraint chair on an inmate or detainee

required that the process and procedure of placing the inmate or detainee into the restraint chair be filmed, videotaped or electronically recorded.

32.    That the area in which the restraint chair that was used on Mr. Huff was in a room that had video recording devices.

33.    That the GCCJA did not film, videotape or electronically record Mr. Huff being placed into the restraint chair.

34.    That if GCCJA did record Mr. Huff being placed into the restraint chair, the film or recording has been destroyed.

35.    That the GCCJA did not start filming, videotaping or recording Mr. Huff's existence in the restraint chair until he had been in the chair for more than 30 hours.

36.    That at all times pertinent to this action, the policies and procedures of the GCCJA related to the use and implementation of a restraint chair on an inmate or detainee required that the inmate or detainee be under direct and constant observation while in the restraint chair.

37.    That at all times pertinent to this action, the policies and procedures of the GCCJA related to the use and implementation of a restraint chair on an inmate or detainee required that personnel document the observations every fifteen minutes.

38.    That at all times pertinent to this action, the policies and procedures of the GCCJA related to the use and implementation of a restraint chair on an inmate or detainee required that personnel offer the inmate or detainee in the restraint chair the opportunity to use the bathroom whenever appropriate, and no less than every two hours. Such conduct was also required to be documented.

7

39.     That at all times pertinent to this action, the policies and procedures of the GCCJA related to the use and implementation of a restraint chair on an inmate or detainee required that personnel offer the inmate or detainee in the restraint chair the opportunity to eat meals made up appropriate finger foods at proper times. Such conduct was also required to be documented.

40.     That at all times pertinent to this action, the policies and procedures of the GCCJA related to the use and implementation of a restraint chair on an inmate or detainee required that personnel offer hydration to the inmate or detainee in the restraint chair whenever appropriate, but at least every two hours. Such conduct was also required to be documented.

41.     That at all times pertinent to this action, the policies and procedures of the GCCJA related to the use and implementation of a restraint chair on an inmate or detainee required that personnel check the circulation of the inmate or detainee in the restraint chair every four hours. Such conduct was also required to be documented.

42.     That due to Mr. Huff's medical history of heart disease and risk of withdrawals, he should have received regular blood pressure checks and regular assessments as to his medical condition.

43.     That according to jail records, Mr. Huff did not receive regular blood pressure checks or regular assessments of any kind.

44.     That Mr. Huff did not receive his blood pressure medication as prescribed while incarcerated in the GCCJA from June 4, 2016, through June 8, 2016.

45.     That the GCCJA, Goatley and Turn Key knew Mr. Huff was not eating or drinking water while he was confined to the restraint chair.

8

46.     That the GCCJA, Goatley and Turn Key did not offer hydration to Mr. Huff at least every two hours while he was in the restraint chair.

47.     That the GCCJA, Goatley and Turn Key did not offer appropriate food at appropriate times to Mr. Huff while he was in the restraint chair.

48.     That while Mr. Huff was in the restraint chair, GCCJA personnel did offer him food at one point in time, but only in a manner that made it impossible for him to consume the food.

49.     That the written logs on which documentation related to Mr. Huff's confinement to the restraint chair contained information that was false.

50.     That at all material times herein, GCCJA had an average daily inmate population of approximately less than 225.

51.     That at all material times herein, GCCJA was responsible for staffing mental health professionals (including psychiatrists) at GCCJA.

52.     That Mr. Huff died while in the restraint chair on June 8, 2016.

53.     That Defendants know, were told, or have been told that Mr. Huff died more than 30 minutes before anyone checked on him.

54.     That Defendants removed Mr. Huff from the restraint chair before outside medical personnel arrived upon the scene and before any investigation into Mr. Huff's death could take place.

55.     That Defendants made no attempts to resuscitate Plaintiff's decedent for more than 30 minutes before outside medical personnel arrived upon the scene on the day that he died.

56.     That Defendant Sheriff Jerry Niles is responsible for establishing procedures, policies, supervision and training for the orderly, lawful and safe operation of the Garfield County Jail. The duty of Defendant Sheriff Jerry Niles includes ensuring the safety of detainees and the prevention of harm to detainees by law enforcement personnel.

57.     That, as the Sheriff of Garfield County, Defendant Sheriff Jerry Niles had the duty and responsibility of ensuring that the GCCJA operated in a manner that provided and ensured the safety of not only the inmates and detainees, but also the employees of the Garfield County Sheriff's Office and the public at large.

58.     That, as the Sheriff of Garfield County, Defendant Sheriff Jerry Niles had the duty of creating a culture and atmosphere of respect for the policies and procedures of the GCCJA, but also for the rule of law and respect for all human beings.

59.     That, prior to Mr. Huff's death, Defendant Sheriff Jerry Niles engaged in a pattern and practice of violating policies and procedures and creating a culture in which violation of policies and procedures was tolerated and/or encouraged.

60.     That, on March 18, 2016, less than three months before Mr. Huff died, an employee of the Garfield County Sheriff's Department advised Defendant Sheriff Jerry Niles that she had witnessed several occasions of violent and inappropriate behavior by jail employees, including improper strapping of inmates. The behavior had been witnessed and seen by the Sheriff's Department employee on video monitors located at the Garfield County Courthouse; the behavior at issue occurred at the GCCJA.

61.     That the response to the employee's complaint included, but was not limited to, cutting off the video feed from the GCCJA to the Garfield County Courthouse, thus

preventing the Sheriff's Department employees at the Courthouse to monitor and observe the inmates or detainees who were being transported to the Courthouse from the GCD

62.     That the actions or conduct in cutting off he video feed from the jail to the courthouse eliminated important information to the Sheriff's Department employees needed or would utilize in dealing with the inmates or detainees being brought to the Courthouse.

63.     That, prior to the events in question herein, and as a direct cause thereof, Defendant Sheriff Jerry Niles failed to establish and enforce procedures for the safety of detainees who are placed in restraint chairs in the GCCJA, including, but not limited to:

a.     procedures, policies, supervision and training concerning the appropriate manner in which to place a detainee in a restraint chair;

b.     procedures, policies, supervision and training concerning the appropriate manner in which to give a detainee or prisoner in a restraint chair the proper amount of breaks;

c.     procedures, policies, supervision and training of how to monitor those who are placed in a restraint chair; and

d.     procedures, policies, supervision and training of how to administer medication to detainees such as Plaintiff's decedent, Mr. Huff, based on the needs of the detainee and recommendations by his or her physicians.

### III. First Cause of Action-Negligence

64.     That Plaintiff adopts and re-alleges all material allegations in paragraphs 1 through 63 as if set forth below.

65.     That Defendants were negligent in failing to provide Mr. Huff with appropriate and adequate medical care.

66.     That, although Mr. Huff reported a history of hypertension, mental illness, and had informed Defendants of medications he had been taking prior to his arrest, he never received them.

67.     That all Defendants, by and through their agents and employees, failed to administer medication prescribed to Mr. Huff.

68.     That all Defendants failed to provide Mr. Huff with a timely examination by a psychiatrist so as to ensure that he received necessary medications that he had been taking prior to his incarceration.

69.     That all Defendants failed to perform regular blood pressure checks on Plaintiff's Decedent, Mr. Huff.

70.     That all Defendants performed no blood pressure checks on Plaintiff's Decedent, Mr. Huff, nor performed a physical examination of any kind on Mr. Huff.

71.     That all Defendants failed to a) provide Mr. Huff with appropriate psychiatric care on or prior to June 8, 2016, and b) take any action to avoid or treat withdrawal symptoms despite knowing he was a specific risk for such problems.

72.     That all Defendants failed to provide Mr. Huff with reasonable psychiatric care throughout his incarceration at GCCJA.

73.     That all Defendants were negligent in permitting Mr. Huff to go days without receiving necessary psychiatric medication.

74.     That all Defendants were negligent in permitting Mr. Huff to go days without receiving psychiatric medication he had been taking prior to his incarceration at GCCJA.

75.     That Defendants failed to perform regular sight checks on Mr. Huff despite the fact that he suffered from multiple medical conditions which necessitated constant monitoring.

76.     At the time of Mr. Huff's detention, the Jail Staff and the Medical Staff were trained to know that violent behavior may mask dangerous medical condition.

77.     That Mr. Huff was arrested on June 4, 2016, and being detained for public intoxication.

78.     That Defendants had previous experience with Mr. Huff based on detaining him in the GCCJA on prior occasions, and knew that he had a history of problems with alcohol and was subject to symptoms of withdrawals from alcohol.

79.     That, from the time he was arrested on June 4, 2016, through the time he died on June 8, 2016, Mr. Huff did not consume any alcohol.

80.     That, from the time he was placed in the restraint chair until the time he died on June 8, 2016, Mr. Huff did not consume any alcohol.

81.     That, after being detained on June 4, 2016, Mr. Huff began to suffer from, and exhibited signs and symptoms of, alcohol withdrawal.

82.     The none of the Defendants herein provided care or treatment to Mr. Huff for alcohol withdrawal from the time he was detained on June 4, 2016, through the time he died on June 8, 2016.

83.     That, from June 6, 2016, until he died on June 8, 2016, Defendants failed to ensure that Mr. Huff received timely breaks from the restraint chair.

84.     That, from June 6, 2016, until he died on June 8, 2016, Defendants failed to ensure that Mr. Huff received timely breaks from the restraint chair to go to the restroom.

85.     That, from June 6, 2016, until he died on June 8, 2016, Defendants failed to ensure that Mr. Huff received sufficient food or water.

86.     That the lack of breaks from the restraint chair from June 6, 2016 through the time he died on June 8, 2016, resulted in Mr. Huff soiling and defecating on himself while in the restraint chair.

87.     That, from June 6, 2016, until he died on June 8, 2016, Defendants did not allow Mr. Huff to change clothes.

88.     That, from June 6, 2016, until he died on June 8, 2016, Mr. Huff was not provided, and not allowed to consume, enough water to remain hydrated.

89.     That, from June 6, 2016, until he died on June 8, 2016, Mr. Huff was not provided, and not allowed to consume, enough food to help him withstand the stress of being in the restraint chair.

90.     That Mr. Huff died due to conditions related to his withdrawal from alcohol, and the effects it had on his body and system.

91.     That the lack of food and water from June 6, 2016, through June 8, 2016, exacerbated the conditions described above and further caused or contributed to the death of Mr. Huff.

92.    That the lack of water and food from June 6, 2016, through June 8, 2016, caused or contributed to the exacerbation of Mr. Huff's health conditions that led to him dying in the restraint chair on June 8, 2016.

93.    That Defendants Sheriff Jerry Niles, Jennifer Niles, Turn Key and Goatley knew that Mr. Huff was placed in a restraint chair on June 6, 2016, and knew that he remained or was placed in the chair every day from June 6, 2016, through the time he died on June 8, 2016.

94.    That Defendant Jennifer Niles ordered that Mr. Huff be placed in a restraint chair on June 6, 2016, and was on notice that he remained or as placed in the chair every day from June 6, 2016, through the time he died on June 8, 2016.

95.    That Defendant Jennifer Niles was the Jail Administrator and/or Detention Administrator of the GCCJA at all times pertinent to this action.

96.    That the Jail Administrator and/or Detention Administrator of the GCCJA is responsible for the administration and supervisory control involving the operations of the GCCJA.

97.    That the Jail Administrator and/or Detention Administrator of the GCCJA at all times pertinent to this action was required to maintain a maximum knowledge of the day-to-day operational requirements and governing policies and procedures of the GCCJA, and had the opportunity to observe shortcomings and take those actions necessary to correct the discrepancies in at timely manner.

98.     That the Jail Administrator and/or Detention Administrator of the GCCJA at all times pertinent to this action was the ranking supervisor, who worked directly for Defendant Sheriff Jerry Niles and was responsible for compliance with the Policies and Procedures of the GCCJA, the Oklahoma Minimum Jail Standards and applicable federal statutes.

99.     That the Jail Administrator and/or Detention Administrator of the GCCJA at all times pertinent to this action was required to establish training requirements to comply with state and federal standards.

100.     That the Jail Administrator and/or Detention Administrator of the GCCJA at all times pertinent to this action was responsible for a) reviewing that appropriate disciplinary actions taken were in compliance with established procedures, b) overseeing that an inmate's medical needs were met and were in compliance with established policies; and c) reviewing and approving all incident reports, forward accurate and completed reports to the Sheriff with appropriate recommendations.

101.     That an investigation of the Mr. Huff's death was conducted by the GCCJA, and statements were obtained from personnel who were involved in placing Mr. Huff into the restraint chair and who were present on the date of his death.

102.     That based on the investigation that was conducted, neither Defendant Sheriff Niles nor Defendant Jennifer Niles recommended that anyone involved in the care, custody, control or supervision of Mr. Huff be disciplined, and no one to this date has been disciplined based on how Mr. Huff was treated at the GCCJA from June 4, 2016, through June 8, 2016.

103.    That, while the Jail Administrator and/or Detention Administrator is charged with operation and supervision of the GCCJA, the same duties and responsibilities outlined above are also applicable to Defendant Sheriff Jerry Niles.

104.    That Sheriff Niles was aware of a pattern of misconduct as it relates to using the restraint chair, and responded inappropriately and with deliberate indifference to the use of the restraint chair.

105.    That Jennifer Niles was aware of a pattern of misconduct, as it relates to using the restraint chair, and responded inappropriately and with deliberate indifference to the use of the restraint chair.

106.    That leaving a detainee or prisoner in a restraint chair for 2½ days without obtaining medical approval for being placed in the restraint chair, allowing a break at least every two hours, and for more than 48 hours, is a violation of the policies and procedures related to the use of a restraint chair in the Garfield County Jail at the time Mr. Huff was in the Garfield County Jail between June 6-8, 2016.

107.    That placing a detainee in a restraint chair for more than 48 hours without food or water being administered, without the detainee receiving his medications and without breaks at least every two hours constitutes cruel and unusual punishment.

108.    That Defendants deliberately failed to take remedial action in the face of the constitutional violations and violations of the policies and procedures of the State of Oklahoma and/or Garfield County as it relates to the use of the restraint chair.

109.    That, prior to Mr. Huff being placed in the restraint chair, Defendant Sheriff Jerry Niles and BOCC had received complaints and were put on notice that the chair was not being used properly.

110.    That Defendant Sheriff Jerry Niles and BOCC were negligent in failing to investigate and adequately respond to prior complaints.

111.    That Defendant Sheriff Jerry Niles and BOCC were negligent in failing to properly train and supervise jailers and other staff working at the GCCJA so as to prevent the improper and/or inappropriate use of the restraint chair.

112.    That Defendants, Defendant Sheriff Jerry Niles, Jennifer Niles and Garfield County (BOCC), were negligent in failing to establish and enforce internal rules, policies and procedures and state law governing the operations of jails within the State of Oklahoma.

113.    That Defendants, Defendants Sheriff Jerry Niles, Jennifer Niles and Garfield County (BOCC) had a duty under state law to the public, and to Plaintiff's decedent, to enforce and uphold internal rules, policies and procedures and state law governing the operations of jails within the State of Oklahoma and prevent the improper and inappropriate use of restraint chairs in the Garfield County Jail.

114.    That in addition to the actions listed above, the actions and conduct, in the alternative, also consisted of assault and battery upon Mr. Huff as supported by the allegations herein, to-wit:

   a.    Defendants Jerry Niles, Jennifer Niles, GCCJA, Turn Key and Goatley, through their failure to offer alternatives required by law (described herein related to the use of handcuffs, etc.), physically forced Mr. Huff into the restraint chair;

b.    Defendants Jerry Niles, Jennifer Niles, GCCJA, Turn Key and Goatley, through forcing Mr. Huff to remain in the restraint chair for more than fifty hours without being released, and keeping him confined, combined to engage in the harmful touching of Mr. Huff through forcing him into the chair and using the instrumentation of the chair to keep him confined;

c.    Defendants GCCJA and Turn Key, by and through employees unidentified by name to-date, physically made unwarranted and non-consensual contact with Mr. Huff;

d.    The actions of Defendants Jerry Niles, Jennifer Niles, GCCJA, Turn Key and Goatley, through physically forcing Mr. Huff into the chair and confining him to the chair for more than fifty hours as described herein were done with the intent to punish and harm Mr. Huff, even though the policies and procedures related to the use of the chair expressly prohibited using the chair as and for punishment;

e.    The actions of Defendants Jerry Niles, Jennifer Niles, GCCJA, Turn Key and Goatley, by and through their threats and verbal statements forcing him into the restraint chair caused Mr. Huff to be in apprehension of imminent, harmful or offensive contact; and

f.    Defendants Turn Key and Goatley, as medical providers, had the ability to require Mr. Huff be removed from the restraint chair for medical treatment and/or medical reasons, but failed, refused and neglected to do so.

IV.    Additional allegations of Negligence against Defendant Jennifer Niles

115.    That Plaintiff adopts and re-alleges all material allegations in paragraphs 1 through 114 as if set forth below.

116.    That as the Jail Administrator, Jennifer Niles was charged with knowledge as to the proper use of a restraint chair.

117.    That at the time of Mr. Huff's detention, the policies and procedures of the State of Oklahoma and Garfield County in place for the use an implementation of restraint chairs were designed to ensure the health and safety of detainees such as Mr. Huff; the stated

purpose of the restraint chair is only to protect the detainee, other persons and property if they are at risk, and it is not to be used as punishment.

118.    That at the time of Mr. Huff's detention, the policies and procedures of the State of Oklahoma and Garfield County in place for the use an implementation of restraint chairs required that a medical clearance or approval be obtained before placing a person in the restraint chair.

119.    That at the time of Mr. Huff's detention, the policies and procedures of the State of Oklahoma and Garfield County in place for the use an implementation of restraint chairs required that the person confined to a restraint chair be released at least every two hours, and be allowed to use the restroom.

120.    That at the time of Mr. Huff's detention, the policies and procedures of the State of Oklahoma and Garfield County in place for the use an implementation of restraint chairs required that the person confined to a restraint chair be given proper food and liquids during the time he/she is confined to the restraint chair.

121.    That at the time of Mr. Huff's detention, the policies and procedures of the State of Oklahoma and Garfield County in place for the use an implementation of restraint chairs required that the person confined to a restraint chair be evaluated by medical personnel every two hours.

122.    That at the time of Mr. Huff's detention, the policies and procedures of the State of Oklahoma and Garfield County in place for the use an implementation of restraint chairs required that the shift supervisor or Defendant Turn Key (the Medical staff) check the

detainee to make sure the restrains are not too tight to impeded circulation to cause harm to the detainee.

123.    That at the time of Mr. Huff's detention, the policies and procedures of the State of Oklahoma and Garfield County in place for the use an implementation of restraint chairs required that the staff monitor the detainee every fifteen (15) minutes.

124.    That at the time of Mr. Huff's detention, the policies and procedures of the State of Oklahoma and Garfield County in place for the use an implementation of restraint chairs required that the staff offer opportunity to use the bathroom at least every two (2) hours.

125.    That at the time of Mr. Huff's detention, the policies and procedures of the State of Oklahoma and Garfield County in place for the use an implementation of restraint chairs required that the staff will offer hydration (water) whenever appropriate, but at least every two (2) hours.

126.    That at the time of Mr. Huff's detention, the policies and procedures of the State of Oklahoma and Garfield County in place for the use an implementation of restraint chairs required that Staff offer opportunity for finger foods at the scheduled meal times.

127.    That at the time of Mr. Huff's detention, the policies and procedures of the State of Oklahoma and Garfield County in place for the use an implementation of restraint chairs required that the staff conduct circulation checks at least every hour.

128.    That at the time of Mr. Huff's detention, the policies and procedures of the State of Oklahoma and Garfield County in place for the use an implementation of restraint

chairs required that the detainee's behavior constitute continued use of the Restraint Chair, and approval to keep the detainee in the chair for more than four (4) hours was required to be obtained from Medical or a Mental Health Professional, which would have been furnished by Defendant Turn Key pursuant to its contract listed above.

129. That at the time of Mr. Huff's detention, the policies and procedures of the State of Oklahoma and Garfield County in place for the use an implementation of restraint chairs required that the detainee's behavior constitute continued use of the Restraint Chair, and continuation for more than eight (8) hours required the detainee to be examined by Medical personnel, all of which would have been furnished by Defendant Turn Key pursuant to its contract listed above.

130. That at the time of Mr. Huff's detention, the policies and procedures of the State of Oklahoma and Garfield County in place for the use an implementation of restraint chairs required that the detainee's entire stay in the Restraint Chair be recorded, and the Detention Facility Administrator was required to save the video.

131. That at the time of Mr. Huff's detention, the policies and procedures of the State of Oklahoma and Garfield County in place for the use an implementation of restraint chairs required that before a detainee is placed in the restraint chair, the Health Services staff or a qualified health care professional (QHCP) –which would have been furnished by Defendant Turn Key pursuant to its contract listed above – were required to 1) examine the inmate to ascertain if the restraints were too tight and to check for injuries incurred during the restraining application, and 2) review the inmate's medical record immediately after the

initial assessment is complete to identify any pre-existing medical condition that might affect the use of such restrains. Such medical condition was required to be documented in the medical/clinical record; however, Defendants Turn Key and Goatley failed, refused and neglected to do so.

132.   That at the time of Mr. Huff's detention, the policies and procedures of the State of Oklahoma and Garfield County in place for the use an implementation of restraint chairs required that before a detainee is placed in the restraint chair, the Health Services staff or a qualified health care professional (QHCP) –which would have been furnished by Defendant Turn Key pursuant to its contract listed above – were required to review the inmate's medical record for any medical condition that may affect the use of the restraint chair prior to its use. Such medical condition will be documented in the medical/clinical record; however, Defendants Turn Key and Goatley failed, refused and neglected to do so.

133.   That at the time of Mr. Huff's detention, the policies and procedures of the State of Oklahoma and Garfield County in place for the use an implementation of restraint chairs required that a restrained inmate will be checked every fifteen minutes, to include a circulation check by the QHCP –which would have been furnished by Defendant Turn Key pursuant to its contract listed above – who was required to immediately report any unusual medical problems to the health care provider. These checks were to be documented in the restricted housing unit (RHU) custody log or unit activity log.

134.   That at the time of Mr. Huff's detention, the policies and procedures of the State of Oklahoma and Garfield County in place for the use an implementation of restraint

chairs required that the inmate will not be left in the restraint chair longer than two hours at a time. A determination will be made at two hours on whether the inmate's behavior dictates further restraint. Any period of restraint in excess of two hours will require review and determination by the facility head and the QHCP or the highest-ranking medical professional on duty, the latter two of which would have been provided by Defendant Turn Key. lf further restraint was necessary, a determination was to be made on the type of restraints that would be used (e.g walking restraints, four point restraints and five point restraints). All continued use of restraints must be documented in the RHU custody log or unit activity log.

135.    That at the time of Mr. Huff's detention, the policies and procedures of the State of Oklahoma and Garfield County in place for the use an implementation of restraint chairs required that before a restraint chair could be used, the following was required:

a.      A "Custody Control Belt Documentation" will be completed by the shift supervisor in charged, prior to any use of force; and

b.      The shift supervisor was required to give the inmate a direct order to submit to handcuffs before placement in the restraint chair.

136.    That Defendant Jennifer Niles did not follow the Custody Control Belt Documentation requirements, nor gave an order for Mr. Huff to submit to handcuffs before placement in the restraint chair.

V. <u>Further Specific Allegations Against Defendants Jennifer Niles and Jerry Niles</u>

137.    Plaintiff adopts and re-alleges all material allegations in paragraphs 1 through 136 as if set forth below.

138.    That Defendant Jennifer Niles and Defendant Jerry Niles both acted as a final

policy maker for the GCCJA and the operation and supervision of the jail, its employees and

the treatment and care of inmates. Further, Defendant Jennifer Niles and Defendant Jerry

Niles were at all times pertinent to this action responsible for approving, ratifying and

enforcing the rules, regulations, policies, practices, procedures, and/or customs that violated

Mr. Huff's rights as set forth in this Complaint.

139.    That as noted in paragraphs 8 and 10, above, the actions and conduct of both

Defendant Jennifer Niles and Defendant Jerry Niles were outside the scope of their

employment as it relates to both the violations of the policies, procedures and rules related

to the use of the restraint chair, especially to the extent that they created and developed and

implemented a plan, policy, procedure, habit and/or custom that was contrary to state and

federal law.

140.    That both Defendant Jennifer Niles and Jerry Niles were outside the scope of

their employment by creating a system and culture in which the use of the restraint chair was

governed by the creation of flawed training protocols, lack of supervision and tolerance of

numerous constitutionally infirm activities of subordinates, to-wit:

a.    Establishing a pattern and practice in which the jail and medical providers
      abused the use of the restraint chair by confining detainees or inmates without
      obtaining medical approval, contrary to Oklahoma law and the policies and
      procedures of the State of Oklahoma and GCCJA;

b.    Establishing a pattern and practice in which the jail and medical providers
      abused the use of the restraint chair by not releasing detainees or inmates from
      the chair every two hours, contrary to Oklahoma law and the policies and
      procedures of the State of Oklahoma and GCCJA;

c.  Establishing a pattern and practice in which the jail and medical providers abused the use of the restraint chair by not recertifying the detainees or inmates to continue in the chair every two or four hours, contrary to Oklahoma law and the policies and procedures of the State of Oklahoma and GCCJA;

d.  Establishing a pattern and practice in which the jail and medical providers abused the use of the restraint chair by confining detainees or inmates to the restraint chair for more than eight (8) hours, contrary to Oklahoma law and the policies and procedures of the State of Oklahoma and GCCJA;

e.  Establishing a pattern and practice in which the jail and medical providers abused the use of the restraint chair by not offering detainees or inmates opportunities for proper food and hydration, contrary to Oklahoma law and the policies and procedures of the State of Oklahoma and GCCJA; and

f.  Confining inmates for punitive reasons not related to protection of themselves or others.

141.  Defendants Jennifer Niles and Jerry Niles knew of these violations of citizen's constitutional rights and acquiesced to the same, without taking any corrective action or disciplining those involved.

VI. Further Specific Allegations Against Defendants Turn Key and Goatley

142.  That Plaintiff adopts and re-alleges all material allegations in paragraphs 1 through 141 as if set forth below.

143.  That at the time of Mr. Huff's detention, the policies and procedures of the State of Oklahoma and Garfield County in place for the use an implementation of restraint chairs required that the detainees confined to a restraint chair were required to be monitored continuously and provided medical treatment, if needed.

144.  That Defendant Turn Key had a medical contract with the Garfield County Detention Center and Board of County Commissioners to provide all medical services to the

Garfield County Detention Center. Pursuant to the contract, Turn Key was required to provide qualified healthcare providers to treat and care for detainees and inmates of the Garfield County Detention Center at all times pertinent to this action.

145.     That Defendant Goatley is and was at all times pertinent to this action a nurse practitioner licensed to practice under the laws of the State of Oklahoma. At all times pertinent to this action, Defendant Goatley was placed at the Garfield County Detention Center and had a duty to provide proper care, treatment and medical services to Mr. Huff.

146.     That Defendant Goatley knew the policies and procedures related to a detainee or inmate who is confined to a restraint chair, and had a duty to obey and enforce all of the rules, policies and procedures, as well as stated and federal rules listed above.

147.     That Defendant Goatley was present June 6-8, 2016, when Mr. Huff was confined to the restraint chair in the Garfield County Detention Center.

148.     That Mr. Huff had been detained in the GCCJA in May of 2016, less than 30 days earlier from the June 2016 detention that led to his death.

149.     That in May of 2016, Defendant Turn Key received medical records from other prior medical providers pursuant to a medical authorization Mr. Huff signed on May 13, 2016. Defendant Goatley, as an employee of Defendant Turn Key and based on her experience as a nurse and review of the records when they were obtained on or about May 13, 2013, knew that:

a.     As of May 4, 2016, Mr. Huff suffered from coronary arteriosclerosis;

b.     As of May 4, 2016, Mr. Huff suffered from depressive disorder;

27

c.     As of May 4, 2016, Mr. Huff suffered from hypertensive disorder;

d.     As of May 4, 2016, Mr. Huff suffered from mental health problems;

e.     As of May 4, 2016, Mr. Huff used alcohol regularly, at least 3-5 times per week per his history;

f.     As of January 8, 2015, when it related to Substance Abuse, Mr. Huff's Risk Assessment was that he was a High Risk;

g.     Mr. Huff's abuse of alcohol was constant and reason for his ingestion of alcohol was because he "is addicted," and that a 12 pack was not a lot for him;

h.     Mr. Huff had suffered from seizure-like activity on or about April 30-May 1, 2016;

i.     Mr. Huff was supposed to be on daily blood pressure medication and was on the same as of May of 2016;

j.     Mr. Huff had a history dating back to 2013 of alcohol abuse, anxiety; and congestive heart failure, cardiomyopathy, depression, hypertension (and was on daily blood pressure medications (amongst others).

150.     That based on the medical records and treatment from his May 2016 detention, and the intake information on June 4, 2016 for the detention period at issue, Defendant Goatley knew the medical history and medical needs of Mr. Huff, as listed above, when he was detained again on or about June 4, 2016.

151.     That Defendant Goatley knew that, given Mr. Huff's conditions of alcohol abuse and addiction, high risk of substance abuse, cardiology problems and blood pressure problems, Mr. Huff was at risk and had a substantial certainty of serious injury or death if he was not given appropriate medical care and treatment.

152.     That Defendant Goatley was told, while Mr. Huff was in the restraint chair, that Mr. Huff was in physical distress and knew that something needed to be done, i.e., that he

needed care and/or treatment or that he was substantially certain to suffer serious injury or death; however, Defendant Goatley was negligent in that she failed, refused and neglected to a) examine Mr. Huff, b) treat or care for Mr. Huff, and c) contact any physicians or persons of higher medical skill or position to provide the care Mr. Huff required.

153.    That based on the intake sheet and records related to Mr. Huff, as well as her experience from his prior incarcerations or detentions, Defendant Goatley knew he was susceptible of having withdrawals from alcohol and problems with high blood pressure, and was negligent in her failure to treat Mr. Huff when he exhibited signs of the same.

154.    That Defendant Goatley was specifically told that Mr. Huff was in distress, needed treatment and needed to see someone, but she failed, refused and neglected to provide any treatment; rather, she simply looked through a window at Mr. Huff, stated she was not going to do anything, and purposely refused to do anything to aid or assist Mr. Huff. Such conduct was both negligent and evidence of a deliberate indifference toward Mr. Huff.

155.    That Defendant Goatley knew from her observations, prior experience with Mr. Huff and knowledge of Mr. Huff's condition that Mr. Huff needed further medical care, but failed, refused and neglected to contact a physician. Defendant Goatley's observations included, but were not limited to, the obvious signs and symptoms of withdrawing from alcohol such as uncontrolled, violent behavior or acting out, tremors, sweating and, later while becoming passive, docile, a reduced conscious state and eventually becoming unconscious.

156.    That Defendant Goatley knew and observed that Mr. Huff's behavior indicated he was having physical problems related to his blood pressure and alcohol withdrawals based on his behavior, but took no action to render treatment.

157.    That Defendant Goatley was further negligent in the following manners:

a.    She failed, refused and neglected to examine Mr. Huff at any time he was in the restraint chair and make sure he was medically cleared or fit to be confined to the restraint chair;

b.    She failed to follow the policies and procedures listed above that required Mr. Huff to be released at least every two hours, and be allowed to use the restroom;

c.    She failed to follow the policies and procedures listed above that required Mr. Huff to be given proper food and liquids during the time he was confined to the restraint chair;

d.    She failed to follow the policies and procedures listed above that required Mr. Huff to be evaluated by medical personnel every two hours;

e.    She failed to follow the policies and procedures listed above that required herself or other medical personnel to check Mr. Huff to make sure the restrains are not too tight to impeded circulation to cause harm to the detainee;

f.    She failed to follow the policies and procedures listed above that required her to monitor Mr. Huff every fifteen (15) minutes;

g.    She failed to follow the policies and procedures listed above that required Mr. Huff to use the bathroom at least every two (2) hours;

h.    She failed to follow the policies and procedures listed above that required her to offer hydration (water) whenever appropriate, but at least every two (2) hours;

i.    She failed to follow the policies and procedures listed above that required her to conduct circulation checks at least every hour;

j.    She failed to follow the policies and procedures listed above that required her to evaluate whether Mr. Huff's behavior required continued use of the

Restraint Chair, and give approval to keep the detainee in the chair for more than four (4) hours.

k.    She failed to follow the policies and procedures listed above that required her to evaluate whether Mr. Huff's behavior required continued use of the Restraint Chair, and continuation for more than eight (8) hours.

l.    She failed to follow the policies and procedures listed above that required her to 1) examine Mr. Huff to ascertain if the restraints were too tight and to check for injuries incurred during the restraining application, and 2) review Mr. Huff's medical record immediately after the initial assessment to identify any pre-existing medical condition that might affect the use of such restraints.

m.    She failed to follow the policies and procedures listed above that required her review Mr. Huff's medical record for any medical condition that may affect the use of the restraint chair prior to its use.

n.    She failed to follow the policies and procedures listed above that required her to check Mr. Huff every fifteen minutes, to include a circulation check, and immediately report any unusual medical problems.

o.    She failed to determine, every two hours, that Mr. Huff's behavior dictated further restraint was needed, conduct the review required by law and policies and procedures, and determine the type of restraints that were still needed (e.g walking restraints, four point restraints five point restraints), even after he was in the chair for more than eight hours and, according to the only video available, had become docile and compliant.

158.    That Defendant Turn Key knew or should have known the policies and procedures related to a detainee or inmate who is confined to a restraint chair, and had a duty to obey and enforce all of those rules listed in Paragraphs x-x, above.

159.    That Defendant Turn Key was present June 6-8, 2015, when Mr. Huff was confined to the restraint chair in the Garfield County Detention Center.

160.    That Defendant Turn Key was negligent in that it failed, refused and neglected to review the records related to Mr. Huff related to his past treatment in the facility, which

advised that he suffered from blood pressure and alcohol issues, as well as failing to provide sufficient access to a physician and/or sufficient supervision of lower licensed providers by a physician.

161.   That Defendant Turn Key was told that Mr. Huff was in physical distress and knew that something needed to be done, i.e., that he needed care and/or treatment; however, it was negligent in failing to a) examine Mr. Huff, b) treat or care for Mr. Huff, and c) contact any physicians or persons of higher medical skill or position to provide the care Mr. Huff required.

162.   That based on the intake sheet and records related to Mr. Huff, Defendant Turn Key knew or should have known he was susceptible with withdrawals from alcohol and problems with high blood pressure, and was negligent in her failure to treat Mr. Huff when he exhibited signs of the same.

163.   That Defendant Turn Key was told that Mr. Huff needed treatment and needed medical treatment, but it failed, refused and neglected to provide any treatment. Such conduct was both negligent and evidence of a deliberate indifference toward Mr. Huff.

164.   That Defendant Turn Key knew that Mr. Huff needed further medical care, but failed, refused and neglected to contact a physician.

165.   That Defendant Turn Key knew that Mr. Huff's behavior indicated he was having physical problems related to alcohol withdrawals based on his behavior, but took no action to render treatment.

166.    That Defendant Turn Key, pursuant to its contract with the GCCJA and BOCC, was effectively the medical department of the GCCJA.

167.    That Mr. Huff had previously been detained and released in May of 2016, just one month before the events giving rise to this case.

168.    That Turn Key obtained medical records related to Mr. Huff on or about May 13, 2016, which contained the pertinent medical history of Mr. Huff.

169.    That Defendant Turn Key, through the medical records it received on or about May 13, 2016, from other prior medical providers pursuant to a medical authorization Mr. Huff signed that date, learned that :

   a.    As of May 4, 2016, Mr. Huff suffered from coronary arteriosclerosis;

   b.    As of May 4, 2016, Mr. Huff suffered from depressive disorder;

   c.    As of May 4, 2016, Mr. Huff suffered from hypertensive disorder;

   d.    As of May 4, 2016, Mr. Huff suffered from mental health problems;

   e.    As of May 4, 2016, Mr. Huff used alcohol regularly, at least 3-5 times per week per his history;

   f.    As of January 8, 2015, when it related to Substance Abuse, Mr. Huff's Risk Assessment was that he was a High Risk;

   g.    Mr. Huff's abuse of alcohol was constant and reason for his ingestion of alcohol was because he "is addicted," and that a 12 pack was not a lot for him;

   h.    Mr. Huff had suffered from seizure-like activity on or about April 30-May 1, 2016;

i.     Mr. Huff was supposed to be on daily blood pressure medication and was on the same as of May of 2016; and

j.     Mr. Huff had a history dating back to 2013 of alcohol abuse, anxiety; and congestive heart failure, cardiomyopathy, depression, hypertension (and was on daily blood pressure medications (amongst others).

170.    That in addition to the facts listed above, Defendant Turn Key, from its treatment of Mr. Huff when he was detained on May 14, 2016, knew Mr. Huff needed his blood pressure medication, as it was specifically requested on his Sick Call records.

171.    That Defendant Turn Key, through its agents, servants and employees (that included Defendant Goatley) knew of each of the conditions of Mr. Huff as listed in the paragraphs above, based on their intake interviews and the records they had in their possession from less than 30 days earlier.

172.    That Defendant Turn Key was further negligent in the following manners:

a.     Turn Key failed, refused and neglected to examine Mr. Huff at any time he was in the restraint chair and make sure he was medically cleared or fit to be confined to the restraint chair;

b.     Turn Key failed to follow the policies and procedures listed above that required Mr. Huff to be released at least every two hours, and be allowed to use the restroom;

c.     Turn Key failed to follow the policies and procedures listed above that required Mr. Huff to be given proper food and liquids during the time he was confined to the restraint chair;

d.     Turn Key failed to follow the policies and procedures listed above that required Mr. Huff to be evaluated by medical personnel every two hours;

e.      Turn Key failed to follow the policies and procedures listed above that required herself or other medical personnel to check Mr. Huff to make sure the restrains are not too tight to impeded circulation to cause harm to the detainee;

f.      Turn Key failed to follow the policies and procedures listed above that required her to monitor Mr. Huff every fifteen (15) minutes;

g.      Turn Key failed to follow the policies and procedures listed above that required Mr. Huff to use the bathroom at least every two (2) hours;

h.      Turn Key failed to follow the policies and procedures listed above that required her to offer hydration (water) whenever appropriate, but at least every two (2) hours;

i.      Turn Key failed to follow the policies and procedures listed above that required her to conduct circulation checks at least every hour;

j.      Turn Key failed to follow the policies and procedures listed above that required her to evaluate whether Mr. Huff's behavior required continued use of the Restraint Chair, and give approval to keep the detainee in the chair for more than four (4) hours.

k.      Turn Key failed to follow the policies and procedures listed above that required her to evaluate whether Mr. Huff's behavior required continued use of the Restraint Chair, and continuation for more than eight (8) hours.

l.      Turn Key failed to follow the policies and procedures listed above that required her to 1) examine Mr. Huff to ascertain if the restraints were too tight and to check for injuries incurred during the restraining application, and 2) review Mr. Huff's medical record immediately after the initial assessment to identify any pre-existing medical condition that might affect the use of such restrains.

m.      Turn Key failed to follow the policies and procedures listed above that required her review Mr. Huff's medical record for any medical condition that may affect the use of the restraint chair prior to its use.

n.      Turn Key failed to follow the policies and procedures listed above that required her to check Mr. Huff every fifteen minutes, to include a circulation check, and immediately report any unusual medical problems.

o.   Turn Key failed to determine, every two hours, that Mr. Huff's behavior dictated further restraint was needed, conduct the review required by law and policies and procedures, and determine the type of restraints that were still needed (e.g walking restraints, four point restraints five point restraints), even after he was in the chair for more than eight hours and, according to the only video available, had become docile and compliant.

173.   That based upon information and belief, Turn Key and/or its employees will take the position they sought, at some point, to provide treatment or care to Mr. Huff but were refused access to Mr. Huff and/or told by persons employed by the GCCJA to not render aid or assistance.

174.   That based upon information and belief, neither Turn Key nor any of its employees attempted to go up the chain of command or to anyone at the GCCJA or BOCC to report they were being denied access or refused the right or ability to treat Mr. Huff.

175.   That if the allegations in paragraphs 173 and 174 are true, then Turn Key and its agents, servants and employees were negligent in not pursuing authority from the chain of command to provide care for Mr. Huff who was in the restraint chair without any medical care or assistance being provided.

## VII. Violation of Civil Rights-42 U.S.C. 1983

176.   Plaintiff adopts and re-alleges all material allegations in paragraphs 1 through 175 as if set forth below.

177.   That Defendants Jerry Niles, Jennifer Niles, Goatley, Turn Key, GCCJA and BOCC deprived Mr. Huff of rights and privileges afforded to him under the Fourth, Eighth and Fourteenth Amendments of the United States Constitution in violation of 42 U.S.C. §1983.

36

178.    That Defendants Jerry Niles, Jennifer Niles, Goatley, Turn Key, GCCJA and BOCC have an affirmative duty to protect inmates from present and continuing harm and to ensure they receive adequate food, clothing, shelter and medical care.

179.    That at all material times herein, Defendants Jerry Niles, Jennifer Niles, Goatley, Turn Key, GCCJA and BOCC had an obligation to the citizens of Garfield County to maintain a jail that provided inmates with access to medical care.

180.    That at all material times herein, Defendants Jerry Niles, Jennifer Niles, Goatley, Turn Key, GCCJA and BOCC had an obligation to the citizens of Garfield County to ensure that inmates detained at GCCJA were provided reasonable medical care.

181.    That at all material times herein, Defendants Jerry Niles, Jennifer Niles, Goatley, Turn Key, GCCJA and BOCC had an obligation to the citizens of Garfield County to ensure the serious medical needs of inmates detained at GCCJA were timely and adequately addressed.

182.    That the failure of Defendants Jerry Niles, Jennifer Niles, Goatley, Turn Key, GCCJA and BOCC to adequately attend to Mr. Huff's serious medical condition resulted in him experiencing unnecessary pain.

183.    That the failure to Defendants Jerry Niles, Jennifer Niles, Goatley, Turn Key, GCCJA and BOCC to adequately attend to Mr. Huff's serious medical condition caused or contributed to his death.

184.    That the failure of Defendants Jerry Niles, Jennifer Niles, Goatley, Turn Key, GCCJA and BOCC to adequately attend to Mr. Huff's serious medical condition was in violation of the Eighth Amendment.

185.    That the conduct of Defendants Jerry Niles, Jennifer Niles, Goatley, Turn Key, GCCJA and BOCC evinced a deliberate indifference to the serious medical needs and safety of Mr. Huff.

186.    That GCCJA, Goatley and Turn Key violated their own policies and procedures by failing to conduct repeat blood pressure checks on Mr. Huff after he was admitted to GCCJA on June 4, 2016.

187.    That GCCJA, Goatley and Turn Key failed to provide Mr. Huff with blood pressure medication after he was admitted to GCCJA on June 4, 2016.

188.    That the failure of Defendants GCCJA, Goatley and Turn Key to provide Mr. Huff with prescribed blood pressure medication evinced a deliberate indifference to his serious medical needs.

189.    That GCCJA, Goatley and Turn Key knew that failure to administer blood pressure medication to Plaintiff's decedent, Mr. Huff, could result in him suffering permanent injury or harm.

190.    That the failure of GCCJA, Goatley and Turn Key to provide Plaintiff's decedent, Mr. Huff, with necessary blood pressure medication caused or contributed to his death.

191.     That Defendant Sheriff Jerry Niles exhibited a reckless disregard for the safety and welfare of the inmates detained at GCCJA when he continued to allow Mr. Huff to remain in the restraint chair without the proper amount of food, water or breaks from June 6, 2016, through June 8, 2016.

192.     That Defendant Sheriff Jerry Niles exhibited a reckless disregard for the safety and welfare of the inmates detained at GCCJA when he allowed Mr. Huff to be placed in the restraint chair for 2½ days without having first obtaining a medical consultation or approval.

193.     That the conduct of Defendant Sheriff Jerry Niles and Jennifer Niles clearly violated Mr. Huff's established constitutional rights which a reasonable person in their position would have known.

194.     That at all material times herein, Defendants Sheriff Jerry Niles, Jennifer Niles, Turn Key, Goatley and GCCJA had an obligation to ensure that all detainees at GCCJA received reasonable medical care.

195.     That in failing to take any action to protect Mr. Huff, each of the Defendants acted with deliberate indifference to the safety and constitutional rights of Plaintiff's decedent.

196.     That at all material times herein, Defendants Sheriff Jerry Niles, Jennifer Niles, GCCJA, Goatley and Turn Key had an obligation to ensure that all detainees at GCCJA received reasonable mental health care.

197.     That Mr. Huff did not receive reasonable mental health care.

198.     That Mr. Huff did not receive reasonable medical care.

199.   That Defendant Sheriff Jerry Niles hired Turn Key for purposes of providing medical care to inmates and persons detained at GCCJA.

200.   That the above acts or omissions by Defendants are sufficiently harmful to evidence a deliberate indifference to Mr. Huff's serious medical needs.

201.   That the above acts or omissions by Defendants resulted in Mr. Huff suffering an unnecessary and wanton infliction of pain thereby constituting cruel and unusual punishment forbidden by the Eighth Amendment.

202.   That the above acts or omissions deprived Mr. Huff of the minimal civilized measure of life's necessities.

203.   All of the foregoing was done with reckless disregard of the Mr. Huff's constitutional rights.

## VIII. <u>Defendants Goatley and Turn Key</u>

204.   Plaintiff adopts and re-alleges all material allegations in paragraphs 1 through 203 as if set forth below.

205.   That Mr. Huff had a constitutional right to adequate and/or proper medical care while being detained in the GCCJA.

206.   That Defendants Turn Key and Goatley had a duty, pursuant to their contract and applicable law, to provide the adequate and/or proper medical care required by law.

207.   That Defendants Turn Key and Goatley all knew that Mr. Huff was confined to the restraint chair for more than fifty hours before he died and knew he was confined to the restraint chair from the first hour he was placed in the chair.

208.    That Defendants Turn Key and Goatley all knew that the policies and procedures outlined above, such as requiring a release from the chair every two hours, hydration and food, circulation checks, etc., were all designed to make sure no physical harm would result to a person such as Mr. Huff being confined to the restraint chair.

209.    That Defendants Turn Key and Goatley knew, from both Mr. Huff's prior detention in the GCCJA and the current detention at issue herein, that Mr. Huff suffered from problems with blood pressure, had an alcohol addiction or substance abuse problem, as well as cardiology-related problems, which required hourly and daily treatment, medication and observation. Defendants Turn Key and Goatley both knew, based on the above, that the failure to give Mr. Huff his daily medications and treat his alcohol withdrawal can cause substantial harm to someone like Mr. Huff.

210.    That before and during the time that he was confined to the restraint chair, Defendant Goatley and Defendant Turn Key knew that Mr. Huff was exhibiting signs of alcohol withdrawal, such as tremors, anxiety, restlessness, insomnia and hallucinations.

211.    These signs and symptoms were some of the signs and symptoms that he was exhibiting and used to justify putting Mr. Huff in the restraint chair.

212.    That Defendant Goatley and Turn Key knew that putting someone in a restraint chair for more than fifty hours as described in this Complaint would put additional, substantial and severe stress on Mr. Huff's physical and mental condition, which –if left untreated– would cause serious injury or even death.

213.    That Defendants Turn Key and Goatley knew that the failure to give Mr. Huff proper food or hydration for more than two days, combined with his medical problems and condition, would cause severe medical problems, and he was at substantial risk of serious injury –including death– if he was not timely and properly treated.

214.    That Defendant Goatley was told that Mr. Huff was in physical distress while in the restraint chair, that he showed obvious signs of distress (initially signs of violence due to hallucinations, tremors and anxiety, and as the hours and days went on, becoming docile, passive and had problems with consciousness), that he needed treatment and needed to see someone for medical assistance, but she failed, refused and neglected to provide any treatment; rather, she simply looked through a window at Mr. Huff, stated she was not going to do anything, and purposely refused to do anything to aid or assist Mr. Huff. Such conduct was both negligent and evidence of a deliberate indifference toward Mr. Huff.

215.    That Defendant Goatley and the agents, servants and employees of Turn Key were all trained to know that violent behavior of an inmate or detainee sometimes masks medical problems.

216.    That Defendant Goatley and the agents, servants and employees of Turn Key knew the signs and symptoms of alcohol withdrawal include, but are not limited to, violent behavior.

217.    That Defendant Goatley and the agents, servants and employees of Turn Key knew Mr. Huff was either an alcoholic or had problems with alcohol, and based on their review of the records, their past experience with him in a prior detention, and their medical

training, experience and knowledge possessed even by a lay person, knew Mr. Huff was at risk for a) complications from blood pressure, b) heart failure and c) death if his conditions were not timely treated.

218.    That Defendant Goatley and the agents, servants and employees of Turn Key knew that Mr. Huff required a doctor's attention but failed, refused and neglected to contact, consult or provide a doctor for Mr. Huff.

219.    That the failure of Defendants Turn Key and Goatley to provide medication, hydration, medical care, a doctor's care and/or other treatment for both his blood pressure and alcohol problems caused or contributed to Mr. Huff's death.

220.    That Defendant Goatley and the agents, servants and employees of Turn Key knew that Mr. Huff's problems with blood pressure and withdrawals from alcohol constituted a substantial risk of serious harm by: a) leaving Mr. Huff in the chair for more than fifty hours without allowing him to be released every two hours as required, b) failing to certify every four hours that it was safe to allow him to remain in the chair, c) failing to release him or discontinue the use of the chair after eight hours, d) failing to provide him water at least every two hours, e) failing to provide him with food at meal times, where appropriate, in a manner that he could eat a meal, f) failing to provide him with medication for his blood pressure or withdrawal of alcohol, and g) failing to treat him for his blood pressure or withdrawal symptoms from alcohol.

221.    That Defendant Goatley and agents, servants and employees of Turn Key personally saw the obvious signs and symptoms exhibited by Mr. Huff in relation to his

withdrawing from alcohol and complications from his blood pressure. Those signs and symptoms included violent behavior, acting out, tremors and, later, passive, docile conduct, including passing out or becoming unconscious while in the restraint chair.

222.    That Defendant Goatley and the agents, servants and employees of Turn Key were aware from the facts from the paragraphs above that Mr. Huff was experiencing the same and knew a substantial risk of serious harm existed, which included, but was not limited to, death based on the fact that Defendant Goatley and the agents, servants and employees of Turn Key knew a person in Mr. Huff's condition, confined to a restraint chair for more than fifty hours without any of the care, treatment or assistance listed above, could die.

223.    That, as noted above, Defendant Goatley was told Mr. Huff was in bad physical shape, looked through a window of the door at Mr. Huff and stated she was not going to do anything and was not going to call a physician for anymore help.

224.    That the failure of Defendants Turn Key and Goatley to provide the medical care required by law, and to follow the policies and procedures, national and state standards applicable to persons confined to a restraint chair such as Mr. Huff, including all factors listed above, caused or contributed to the death of Mr. Huff, violated his Constitutional rights and constituted a deliberate indifference to his constitutional rights.

### IX. Defendant Jennifer Niles

225.    That Plaintiff adopts and re-alleges all material allegations in paragraphs 1 through 224 as if set forth below.

226.    That the standards for use of the restraint chair outlined above were in force and in effect at all times pertinent to Mr. Huff being confined to the restraint chair.

227.    That Jennifer Niles, as the Detention Administrator or Jail Administrator, was involved in the decision to place Mr. Huff in the restraint chair and was involved in, and ratified, the decisions to keep him in the chair for more than fifty hours without releasing him.

228.    That Jennifer Niles, as the Detention Administrator or Jail Administrator, was involved in the decisions to violate the policies and procedures of the GCCJA, BOCC and State of Oklahoma in regard to the use of the restraint chair as it relates to the additional decisions to withhold food, hydration and medical treatment, care and medicine.

229.    That the decisions and conduct of Defendant Jennifer Niles violated the policies and procedures and laws of the State of Oklahoma, the GCCJA, the BOCC, which caused or contributed to Mr. Huff's death.

230.    That the decisions and conduct of Defendant Jennifer Niles violated Mr. Huff's constitutional rights as outlined above, which caused or contributed to Mr. Huff's death.

231.    All Defendants knew and/or it was obvious that the maintenance of the aforementioned practices, policies and/or customs posed an excessive risk to the health and safety of detainees like Mr. Huff.

232.    That Defendant Jennifer Niles knew about Mr. Huff's medical condition before he was placed in the restraint chair; knew his medical history of substance or alcohol abuse; knew about his problems with blood pressure and his need for daily blood pressure

medication; knew about his condition related to his heart and congestive heart failure; knew he was exhibiting signs of alcohol withdrawals such as tremors, hallucinations and violence; knew that he was being deprived of food and hydration; knew that he was not being released every two hours, was not recertified for continued confinement to the restraint chair and was being confined for more than fifty hours without being released; and knew from her experience and training that the violations of the policies and procedures and withholding of food, hydration and medical care would cause serious harm and potentially be fatal to Mr. Huff but still allowed the violations to continue.

233.   That Defendant Jerry Niles' violation of Oklahoma nepotism laws created an atmosphere where Jennifer Niles was able to avoid the chain of command and serve in a de facto Sheriff's role at the jail. This lack of accountability ad circumvention of law led to Mr. Huff remaining the restraint chair without interruption.

234.   That all Defendants had a duty to preserve the Constitutional rights of Mr. Huff, to obey state and federal law, and to follow both the law and proper practices and procedures in the use of the restraint chair and provision of medical care, treatment and medication.

235.   That as it relates to the use of the restraint chair and providing medical services, Defendant Turn Key and Goatley established a policy, custom, practice and procedure of:

      a.    Not performing examinations of inmates or detainees before placing them in the restraint chair;

b.      Not conducting circulation checks every fifteen minutes, hourly or daily, while an inmate or detainee was confined to the restraint chair;

c.      Not ensuring the inmate or detainee received food or hydration every two hours or as needed;

d.      Not ensuring the inmate or detainee was allowed breaks or released every two hours and allowed to use the restroom;

e.      Not performing examinations every two hours, or four hours, to make sure the inmate or detainee was physically fit to be remain in the restraint chair;

f.      Not ensuring the inmate or detainee was released after eight hours in the chair; and

g.      Not providing, or withholding, medicine from an inmate or detainee; and

h.      Not providing, or withholding, proper medical care guaranteed to Mr. Huff under federal and state law, including the United States Constitution.

236.    That as it relates to the use of the restraint chair, Defendants Jerry Niles,

Jennifer Niles, GCCJA and BOCC established a policy, practice, custom and procedure of:

a.      Not requiring or allowing examinations of inmates or detainees before placing them in the restraint chair;

b.      Not allowing or requiring circulation checks every fifteen minutes, hourly or daily, while an inmate or detainee was confined to the restraint chair;

c.      Not requiring or ensuring the inmate or detainee received food or hydration every two hours or as needed;

d.      Not requiring ensuring the inmate or detainee was allowed breaks or released every two hours and allowed to use the restroom;

e.      Not requiring or performing examinations every two hours, or four hours, to make sure the inmate or detainee was physically fit to be remain in the restraint chair;

f.      Not requiring the inmate or detainee was released after eight hours in the chair; and

47

g.      Not providing, or withholding, proper medical care, treatment and medicine to Mr. Huff.

237.    That the aforementioned policies, customs, practices and procedures were the direct cause and/or moving force behind the deprivation of Mr. Huff's Constitutional rights as alleged herein and such policies, customs, practices and procedures were enacted and maintained by Defendants with deliberate indifference to an almost inevitable constitutional injury to Mr. Huff and those similarly situated.

238.    That Defendants' conduct, as listed and described herein, were contrary to both federal and state law, deprived Mr. Huff of his Constitutional rights, and by engaging in the conduct described herein and pursuant to their policy, practice, custom and procedures listed above, breached the duties they owed Mr. Huff as described herein.

239.    That the violations of law listed above, by all Defendants, constituted negligence per se under Oklahoma law.

240.    That the violations of their duties under both state and federal law, as well as the United States Constitution, combined with the conduct as evidenced by the establishment of their policies, practices, customs and procedures as outlined above, was the direct cause of Mr. Huff's death.

241.    That allowing such conduct to continue constituted gross negligence, was reckless, and constituted intentional conduct that Defendant Jennifer Niles knew would harm or kill Mr. Huff.

242.    That the conduct of Defendants Jennifer Niles, Jerry Niles and Goatley in violating the policies and procedures of the State of Oklahoma, GCCJA, BOCC and the Constitution of the United States constituted conduct outside the scope of their employment.

48

243.    That the conduct of Defendant Jennifer Niles, Jerry Niles, Goatley, Turn Key, GCCJA and BOCC constituted and evinced a deliberate indifference to the rights of Mr. Huff with the knowledge that such conduct would cause serious harm or death to Mr. Huff.

244.    That the conduct of all Defendants, from the practices of the GCCJA and BOCC in their operations of the jail, to Turn Key and Goatley in the manner in which they conducted themselves as outlined above, was committed with deliberate indifference to the constitutional rights of Mr. Huff and was the direct and proximate cause of Plaintiff's death.

245.    That the deliberate indifference to Mr. Huff's medical needs, as outlined above, were consistent with the policies, procedures and practices of Defendant Turn Key (as the entity charged with providing the constitutionally guaranteed medical care and medical care required by both Oklahoma law and the policies and procedures of both the State of Oklahoma and GCCJA) and is consistent with a pattern, practice, custom and procedures which are clearly its custom and practice and contrary to both state and federal law.

246.    That Turn Key has had at least four other claims made against it in the last three years arising out of claims it failed to provide care to detainees or inmates that resulted in two people dying and two more seriously injured (paralyzed) which was attributed to a delay in medical care, improperly trained staff providing care, etc., which posed excessive risks to the health and safety of inmates and detainees, conduct which was contrary to the requirements under state and federal law.

247.    That the conduct at issue in paragraphs 1-5 above also constitute reckless, intentional and life-threatening conduct that resulted in Mr. Huff's death and entitle Plaintiff to an award of punitive damages.

WHEREFORE, Plaintiff respectfully requests this Court enter Judgment against Defendants for actual and compensatory damages in excess of $75,000.00, award punitive damages, attorney fees, costs, and any and all other relief the Court deems just and equitable.

*s/David B. Donchin*

David B. Donchin, OBA #10783
Hilary S. Allen, OBA #16979
Jennifer K. Christian, OBA #21628
Durbin, Larimore & Bialick
920 North Harvey
Oklahoma City, OK 73102-2610
Telephone:  (405) 235-9584
Facsimile:  (405) 235-0551
dlb@dlb.net
             - and -
Eddie Wyant, OBA #15133
Wyant Law Firm, P.L.L.C.
PO Box 508 - 205 W Maple, Suite 102
Enid, OK 73702
Telephone: (580) 233-7799
Facsimile: (580) 297-5121
eddie@wyantlawfirm.com
             - and -
Randy J. Long, OBA #5515
Clint A. Claypole, OBA #30045
Reagan D. Allen, OBA #19739
Long, Claypole & Blakley Law, PLC
PO Box 3623 - 122 W Randolph
Enid, OK 73702
Telephone:  (580) 233-5225
Facsimile:  (580) 233-3522
randy@lcb.law
clint@lcb.law
reagan@lcb.law
Attorneys for Plaintiff, James Graham, as Special Administrator for the Estate of Anthony Huff, deceased

## CERTIFICATE OF SERVICE

☒I hereby certify that on July 24, 2018, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Chris J. Collins, OBA #1800
Jordan L. Miller, OBA #30892
Collins, Zorn & Wagner, P.C.
429 NE 50th Street, Second Floor
Oklahoma City, OK 73105
Telephone: (405) 524-2070
Facsimile: (405) 524-2078
cjc@czwlaw.com
jlm@czwlaw.com
Attorneys for Defendants, Garfield County Detention Center and Board of County Commissioners of the County of Garfield

Robert S. Lafferrandre, OBA #11897
Randall J. Wood, OBA #10531
Carson C. Smith, OBA #22303
Pierce, Couch, Hendrickson,
Baysinger & Green, L.L.P.
1109 N Francis Ave.
Oklahoma City, OK 73106
Telephone: (405) 235-1611
Facsimile: (405) 235-2904
rlafferrandre@piercecouch.com
rwood@piercecouch.com
csmith@piercecouch.com
Attorneys for Defendant, Jennifer Niles

Alexander C. Vosler, OBA #19589
Sean P. Snider, OBA #22307
Alexandra G. Ah Loy, OBA # 31210
Johnson, Hanan and Vosler
9801 N Broadway Extension
Oklahoma City, OK 73114
Telephone: (405) 232-6100
Facsimile: (405) 232-6105
avosler@johnsonhanan.com
ssnider@johnsonhanan.com
aahloy@johnsonhanan.com
Attorneys for Defendants, Turn Key Health Clinics and Lela Goatley

James L. Gibbs, II, OBA #15689
Goolsby, Proctor, Heefner & Gibbs, P.C.
701 N Broadway Ave., Suite 400
Oklahoma City, OK 73102-6006
Telephone: (405) 524-2400
Facsimile: (405) 525-6004
jgibbs@gphglaw.com
Attorneys for Defendant, Jerry Niles

s/David B. Donchin
David B. Donchin

9996.0156\#17703813v1<OKC> -2018.07-02 Second Amended Complaint